# UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | DOCKET NO. 1:20-CR-126-MOC-WCM |
| v. | **BILL OF INDICTMENT** |
| JOHN PAUL COOK | Violations:<br>18 U.S.C. § 287<br>18 U.S.C. § 641<br>18 U.S.C. § 1001 |

## THE GRAND JURY CHARGES:

### INTRODUCTION

At all times relevant to this Bill of Indictment:

**I. The VA Programs Defrauded**

*A. Disability Compensation Program*

1. Disability compensation is a benefit paid to United States military veterans by the Veterans Benefits Administration of the United States Department of Veterans Affairs (VA) due to injuries or diseases sustained while on active duty, or for injuries or diseases that were made worse by active military service.

2. "Individual Unemployability" (IU) is a unique part of the VA's disability compensation program, allowing the VA to pay certain veterans compensation at the 100 percent rate even though the VA has not rated their service-connected disability at the 100 percent disabling level. To be eligible for Individual Unemployability, the veteran must be unable to maintain substantially gainful employment due to a service-connected condition, and must have either one disability rated at 60 percent disabling or more, or multiple disabilities, with one disability rated at 40 percent or higher and a total rating of 70 percent or more.

### B. *Prosthetics and Sensory Aids Service*

3. The VA operates a program known as the Prosthetics and Sensory Aids Service, through which the VA provides, among other things, funding or reimbursement for adaptive equipment for disabled veterans. One example of this is paying for the costs of some features, such as air conditioning, automatic transmission, and power equipment on a vehicle that will be used on behalf of a disabled veteran.

### C. *Beneficiary Travel Program*

4. For veterans receiving treatment for a service-connected disability, the VA will reimburse the veteran for costs relating to their travel to and from the VA facility at which the veteran receives treatment. If that travel is by private vehicle, the reimbursement is based on the total mileage traveled. The veteran obtains the reimbursement by providing information to the facility's Travel Benefits Office as to the costs of travel and obtaining a voucher, which the veteran then presents to the facility's Agent Cashier's Office, which pays the veteran.

## II. Measuring Visual Acuity

5. Visual acuity is measured as a number indicating the sharpness or clarity of vision. A visual acuity measure of 20/20 means that a person with 20/20 vision who is 20 feet from an eye chart sees what a person with unimpaired vision can see from 20 feet away. A person with 20/100 vision who is 20 feet away from an eye chart can see what a person with unimpaired vision could see from 100 feet away.

6. During eye examinations, the doctor tests the visual acuity of each eye separately and records that measurement for each eye. The doctor also measures the acuity of "both eyes," meaning the score when the patient is using both eyes simultaneously. This would ordinarily be the same measurement as the one for the better eye.

7. A person with 5/200 vision who is 5 feet away from an eye chart can see what a person with unimpaired vision could see from 200 feet away. The VA rates a person with 5/200 vision or worse (including eyesight that is limited to light perception only) as being blind.

## III. The Defendant's Disability Claims

8. The defendant entered on active duty with the United States Army on November 5, 1985. Six months later, on May 5, 1986, he fell from a ladder while on duty and complained that he had hit his head. Although his records showed that he had a lifelong history of amblyopia, sometimes known as "lazy eye," in his right eye, and he had been wearing glasses before enlisting in the Army, he complained that his vision had become worse, especially in his right eye, following the accident.

9. An Army ophthalmology evaluation in May 1987 concluded that he had visual acuity of 20/200 in the right eye and 20/100 in the left eye. An Army medical board ruled that the defendant was "unfit for retention" because his vision could not be corrected with spectacle lenses to at least 20/30 in one eye and 20/200 in the other eye. Based on the board's recommendation, the Army discharged the defendant and placed him on the retired list on August 28, 1987, at 60% disability. The defendant began to receive VA disability compensation.

10. In December 1987, the defendant applied to the VA for increased compensation based on unemployability, stating that he was unable to obtain employment due to his eye injury. That same month, the VA approved the request and issued a rating of Individual Unemployability due to his "severe visual deficit." In February 1988, the defendant reported to a VA visual impairment support worker that "his major losses center on not being able to drive, shop, or read."

11. In June 2005, the defendant submitted another claim for benefits to the VA, based in part on an eye examination conducted at the VA in April 2005, which had concluded from the defendant's responses that the defendant's vision in his right eye was "light perception only" and was 5/200 in his left eye.

12. In October 2005, the VA increased his rating based on blindness from 90% to 100% disabling. The new decision noted that, "This is the maximum evaluation allowed under the law for this disability." The VA also determined that the defendant was entitled to additional benefits: Special Monthly Compensation (an extra monetary allowance paid to a qualifying veteran due to the severity of his disability), Specially Adapted Housing (a grant that goes toward paying for adaptations in a new home), and Special Housing Adaptation (a grant that goes toward remodeling an existing home).

13. The defendant's monthly VA disability payments in 1987 were $1,411 per month. With the increases in his disability rating, as well as cost-of-living adjustments and his Special Monthly Compensation, these payments steadily increased over the years. By 2016, the monthly payment had risen to $3,990. In total, from 1987 through 2017, the defendant received approximately $978,138 in VA disability payments due to his claimed blindness. The VA terminated the defendant's blindness-related disability payments in October 2017.

**IV.     The Defendant's Schemes to Defraud the VA**

*A. Obtaining Disability Compensation*

14. Starting after his discharge from the Army in 1987, the defendant claimed to the VA that his loss of vision was so severe that he had only light perception in his right eye, and that vision in his left eye was only 5/200, and complained that one of the "major losses" caused by his disability was that he could no longer drive. This was the basis for the VA's initially awarding him the disability payments and later increasing his disability rating to 100%.

15. In actuality, however, the defendant was able to see at a far better level than he was claiming to the VA, and he was therefore able to maintain and renew his driver's license throughout the entire time he was receiving these blindness-related disability payments. To obtain those license renewals, he repeatedly passed DMV-mandated eye examinations revealing a significantly less severe level of visual impairment than he was claiming to the VA. The vision acuity levels he displayed during his DMV-mandated eye examinations would have disqualified him for the VA benefits he was receiving.

1. <u>The Defendant Passes His Driver's License Vision Tests</u>

16. In North Carolina, an original or renewing driver's license applicant must take and pass a vision screening test. Applicants who cannot meet the 20/40 acuity standard are referred to an eyecare specialist. Drivers whose vision is correctible to 20/50 or better are restricted to wearing corrective lenses while driving. Drivers whose vision is correctible to 20/70 are restricted to wearing corrective lenses, driving on roads with a speed limit of no more than 45 m.p.h., and not driving on interstate highways. Drivers whose vision is correctible to 20/100 are restricted to all of the above restrictions, plus daylight driving only.

4

17. Applicants whose vision is not correctible to at least 20/100 may not obtain a driver's license.

18. The defendant obtained his first North Carolina driver's license in August 1979. On September 18, 1987 (three weeks after he was discharged from the Army based on his claim to have had visual acuity with glasses of 20/200 in the right eye and 20/100 in the left eye), the defendant was able to renew his North Carolina driver's license.

   *a. The 1995 renewal: 20/30 left eye, 20/200 right*

19. On January 5, 1995, the defendant renewed his North Carolina driver's license again. With corrective lenses, his vision test resulted in a finding of 20/30 vision using both eyes, 20/30 in his left eye, and 20/200 in his right eye. He correctly identified and read all road signs on the test.

   *b. The 2003 renewal: 20/30 left eye, 20/70 right*

20. On July 29, 2003, the defendant initially failed the vision examination for the renewal of his North Carolina driver's license, with a test result of 20/50 using both eyes, 20/50 in his left eye, and 20/200 in his right eye. He also incorrectly read two road signs. Because of the failed examination, he was required to get a vision statement from a physician. The results of the physician's vison examination, dated August 1, 2003, showed 20/30 vision using both eyes, 20/30 in the left eye, and 20/70 in the right eye. As a result, the North Carolina DMV renewed his driver's license.

   *c. The 2008 renewal: 20/40 left eye, 20/70 right*

21. On February 15, 2008, the defendant again renewed his North Carolina driver's license. His vision test with corrective lenses resulted in a score of 20/40 using both eyes, 20/40 in his left eye, and 20/70 in his right eye. He correctly read all the road signs in the test.

   *d. The 2009 South Carolina license: 20/25 left eye, 20/70 right*

22. On September 15, 2009, the defendant applied for a South Carolina driver's license, providing a home address in Inman, South Carolina. In South Carolina, an applicant must pass a visual acuity test with a score of 20/40 or better

with corrective lenses. If the applicant cannot meet that standard, he or she is referred to an eyecare specialist, and must demonstrate visual acuity of at least 20/70 in both eyes together, or 20/70 in the better eye. If, however, one eye is at 20/200 or worse, the better eye must be at least as 20/40.

23. In his handwritten answers on his South Carolina application, the defendant certified under penalty of perjury that he had no physical condition preventing him from safely operating a motor vehicle, and that his doctor had not placed any restrictions on his driving. In support of his application, the defendant submitted a South Carolina DMV "Report of Eye Examination" form, completed by Dr. SM of Asheville following an examination on July 19, 2009. That examination's results were that with his new prescription lenses his vision was 20/25 using both eyes, 20/25 in his left eye, and 20/70 in his right eye. The doctor's report also stated that the defendant needed glasses for distant vision, but not for near vision, and that he had no unusual difficulty in seeing in dim light and did not need to be restricted to daylight driving only. South Carolina issued the defendant a driver's license.

  *e. The 2016 eye exam: 20/25 left eye, 20/70 right*

24. On February 17, 2016, the defendant again visited Dr. SM in Asheville for an eye examination. The defendant told the doctor that one of his reasons for having the exam was that he needed to renew his driver's license. Dr. SM observed that the defendant's corrected vision acuity, when wearing glasses, was 20/25 in his left eye and 20/70 in his right. The doctor's final diagnoses were that the defendant had bilateral myopia (nearsightedness), bilateral regular astigmatism, presbyopia (age-related farsightedness), and amblyopia (lazy eye) of the right eye.

  *f. The 2016 renewal: 20/40 left eye, 20/70 right*

25. The next day, on February 18, 2016, the defendant renewed his North Carolina driver's license. At that time, his vision examination with corrective lenses showed a visual acuity of 20/40 using both eyes, 20/40 in the left eye, and 20/70 in the right eye. He correctly read all the road signs in the test.

 2. <u>The Defendant's Driving and Other Activities</u>

26. Between 2001 and 2016, the defendant and his wife purchased and registered approximately 30 different motor vehicles. The defendant drove vehicles on a regular basis on streets, roads, and highways, including interstate

6

Case 1:20-cr-00126-MOC-WCM   Document 1   Filed 12/01/20   Page 6 of 16

highways and highways with speed limits higher than 45 m.p.h. He also drove his children to school and picked them up from school, drove to medical appointments, to restaurants and shopping, performed errands, and drove on out-of-town trips.

27. From 2010 through 2016, the defendant was actively involved with the Boy Scouts of America (BSA), Daniel Boone Council, including serving as a Den Leader and a Cubmaster. Among the courses the defendant completed with the BSA were courses qualifying him to be a range officer for BB guns and for archery. He was also certified for land navigation, which involves reading maps and using a compass.

28. The defendant frequently drove himself and others to scouting events, including an overnight trip to Charleston, South Carolina. The defendant also acquired a utility trailer to use for scouting and camping activities, and pulled it behind his vehicle.

3. The Defendant Claims Blindness in His VA Eye Examinations

29. During the same time period that the defendant was passing his DMV-mandated eye examinations and was, in fact, regularly driving vehicles on the roads and highways of North Carolina and South Carolina, he was claiming to the VA that he had no more than light perception in his right eye, and that he had severely reduced sight in his left eye, in order to continue receiving his disability payments.

   a. *The 1989 VA exam: 20/400 left eye, no improvement in right*

30. On April 28, 1989, the defendant underwent an eye examination at the VA Medical Center in Johnson City, Tennessee. Based on his responses, the doctor conducting that examination concluded that the defendant had no improvement in his right eye, and that his corrected distance vision in his left eye was 20/400, and his corrected near vision was 20/100.

   b. *The 2016 VA exam: worse than 5/200 and only light perception in each eye*

31. The VA directed the defendant to undergo a Compensation and Pension Examination pertaining to his eyes, conducted on November 17, 2016, by Dr. KW, an optometrist in Weaverville, North Carolina. Dr. KW performed the

7

examination pursuant to a contract with the VA and completed the VA's Eye Conditions Disability Benefits Questionnaire, which she submitted to the VA.

32. The vision tests that Dr. KW performed on the defendant were all subjective, that is, the results were based on the answers provided by the defendant. Based on the responses the defendant provided during that examination, Dr. KW concluded that his uncorrected vision, for both distance vision and near vision, was 5/200 in his left eye and 5/200 in his right eye. She also concluded that his corrected vision for each eye remained at 5/200. She noted, however, that she had simply marked those boxes on the VA form (which were the lowest available boxes) in order to complete the report, but that "the claimant is only light perception (sic) in each eye and cannot see 5/200."

33. With regard to visual acuity, Dr. KW further concluded:

a. that the defendant's vision in each eye was "limited to no more than light perception;"
b. that he was unable to recognize test letters at one foot or closer with his right eye; and
c. that he was unable to perceive objects, hand movements, or count fingers at three feet with either eye.

34. Dr. KW answered "Yes" to this question: "Does the veteran have visual acuity of 20/200 or less in the better eye with the use of a correcting lens based upon visual acuity loss (i.e. USA statutory blindness with bilateral acuity of 20/200 or less)?"

35. As to the defendant's visual fields, based on his responses she concluded that the defendant had a visual field defect and that he was unable to see any target with either eye except for a small area centrally to the left eye. She therefore answered "Yes" to this question: "Does the veteran have legal (statutory) blindness (visual field diameter of 20 degrees or less in the better eye, even if the corrected visual acuity is 20/20) based upon visual field loss?"

36. Finally, Dr. KW concluded that "The impact of the eye condition(s) on the claimant's ability to work is that he cannot see to perform any visual task." Her final diagnosis was "Eye Blindness, Bilateral."

8

> *c. The January 2017 VA exam: 5/200 left eye, only light perception in right*

37. On January 30, 2017, Dr. ZP, an optometrist working under contract with the VA, conducted another eye examination of the defendant at the VA Medical Center in Johnson City, Tennessee. In that examination, the defendant claimed that his vision in his right eye was limited to no more than light perception, and that he could not recognize test letters at one foot or closer with either eye. He also claimed that he was unable to perceive objects, hand movements, or count fingers at a distance of three feet with either eye.

> *d. The August 2017 VA exam: 5/200 distance vision in each eye*

38. The VA contracted with another doctor of optometry, Dr. AL of Asheville, to conduct an eye examination of the defendant on August 25, 2017. Based on the defendant's responses during the exam, the doctor assessed the defendant's visual acuity, with corrective lenses, as 5/200 in each eye for distance vision, 5/200 in the right eye for near vision, and 20/200 in the left eye for near vision. The defendant claimed to be unable to recognize test letters at one foot or closer, although he was able to perceive objects, hand movements, and count fingers at three feet with each eye. Dr. AL concluded that the defendant had a visual acuity of 20/200 or less in the better eye using correcting lenses, and that he was legally blind. Nonetheless, she also recorded:

> PLEASE NOTE: There is no objective evidence that correlates to the Veteran's degree of vision loss. Today's diagnoses of cataracts, floaters, and epiretinal membranes (cellular maculopathy) are all mild in clinical presentation and would not be expected to cause any vision loss. While TBIs [traumatic brain injuries] can certainly cause vision loss, the Veteran's ability to independently move about the office, navigate around coffee tables in the waiting room unaided, and watch for his ride approaching from the windows does not correlate to the degree of vision loss that is suggested from the visual acuity measurements and visual field testing, which are highly subjective.

### B. Obtaining Prosthetics and Sensory Aids Service Payments

39. The defendant used the VA's Prosthetics and Sensory Aids Service to obtain payments from the VA for air conditioning for five of the vehicles he or his wife purchased between 2006 and 2016, while falsely claiming that he not only was entitled to such payments but also claiming that he was not a licensed driver.

40. On April 27, 2006, the defendant submitted a VA "Application for Adaptive Equipment—Motor Vehicle" form for a Honda. In the section of the application form entitled "Driver's License Verification," the defendant stated that he was not licensed. He described his disabilities affecting driving as "Blind one eye, impaired vision other." On April 29, 2006, he submitted a similar application regarding a Chevrolet. He again claimed that he had no driver's license, that he was blind in one eye, and that he had "impaired vision on other – 90%."

41. The defendant submitted similar applications, each one claiming that he had no driver's license and that he was blind in one eye and 90% impaired in the other, on August 26, 2010, August 10, 2012, and on March 10, 2016. The VA approved all five of the defendant's applications and provided him with payments for such "adaptive features" as air conditioning on these vehicles.

### C. Obtaining Beneficiary Travel Program Payments

42. The defendant also defrauded the VA's Beneficiary Travel Program by submitting false claims for reimbursement for travel mileage, based on claiming that he had used his private vehicle to go to and from his VA appointments, when in fact he had been provided with such transportation through a government contractor.

43. On February 6, 2017, special agents of the VA's Office of Inspector General interviewed the defendant. They informed him that he was being investigated for fraud and false claims, that they had surveilled him and had frequently observed him driving various vehicles, and that they knew that he had passed driver's license tests and had been a licensed driver during the entire time he had claimed to the VA that he was blind. They specifically cited as an example of surveillance that they had observed him drive himself to and from numerous appointments at the Charles George VA Medical Center (the VAMC) in Asheville, North Carolina.

44. Following that interview, the defendant did not drive himself in his personal vehicle for his following VAMC appointments, but instead used the services of Mountain Mobility, a community transportation system provided by the Buncombe County government. On March 6, 2017, March 13, 2017, and April 12, 2017, the defendant used Mountain Mobility for transportation between his home and the VAMC.

45. On each of those three dates, however, he nonetheless submitted applications for mileage reimbursements to the VA, claiming that he had used his private vehicle. In the form he submitted with each such claim, the defendant certified falsely: "I have neither obtained transportation at Government expense nor through the use of Government request, tickets, or tokens, and have not used any Government-owned conveyance . . . ."

## COUNT ONE

46. Paragraphs 1 through 45 of this Bill of Indictment are realleged and incorporated herein.

47. From in or about December 1987 and continuing through October 2017, in Buncombe County, within the Western District of North Carolina, and elsewhere, the defendant,

## JOHN PAUL COOK,

knowingly and willfully did steal, purloin, and convert to his own use the money of the United States, that is, disability compensation payments made by the Veterans Benefits Administration of the United States Department of Veterans Affairs, of the value of more than $1,000.

All in violation of Title 18, United States Code, Section 641.

## COUNT TWO

48. Paragraphs 1 through 45 of this Bill of Indictment are realleged and incorporated herein.

49. On or about March 10, 2016, in Buncombe County, within the Western District of North Carolina, and elsewhere, the defendant,

**JOHN PAUL COOK,**

did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, that is, the United States Department of Veterans Affairs, by falsely claiming that he had no driver's license on an Application for Adaptive Equipment—Motor Vehicle, as described more fully in Paragraphs 39 through 41 of this Bill of Indictment. The statement and representation was false because, as the defendant then and there knew, he did possess a valid North Carolina driver's license at that time.

All in violation of Title 18, United States Code, Section 1001.

## COUNT THREE

50. Paragraphs 1 through 45 of this Bill of Indictment are realleged and incorporated herein.

51. On or about November 17, 2016, in Buncombe County, within the Western District of North Carolina, and elsewhere, the defendant,

**JOHN PAUL COOK,**

did willfully and knowingly make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, that is, the United States Department of Veterans Affairs, and did willfully and knowingly falsify, conceal, and cover up by trick, scheme and device a material fact within the jurisdiction of the United States Department of Veterans Affairs. That is, the defendant concealed his true visual acuity by falsely claiming during an eye examination that he had no more than light perception in each eye; that he was unable to recognize test letters at one foot or closer with his right eye; and that he was unable to

12

perceive objects, hand movements, or to count fingers at a distance of three feet with either eye; and by falsely giving responses consistent with having a visual acuity no better than 5/200 in either eye, as described more fully in Paragraphs 31 through 36 of this Bill of Indictment.

All in violation of Title 18, United States Code, Section 1001.

## COUNT FOUR

52. Paragraphs 4 and 42 through 45 of this Bill of Indictment are realleged and incorporated herein.

53. On or about March 6, 2017, in Buncombe County, within the Western District of North Carolina, and elsewhere, the defendant,

### JOHN PAUL COOK,

made and presented to the United States Department of Veterans Affairs claims and demands upon the United States, that is, claims for travel expense reimbursement pursuant to the VA's Beneficiary Travel Program, knowing that the claims were false and fictitious, in that the defendant falsely claimed that he had incurred travel expenses by using a privately owned automobile, and falsely claimed that he had not obtained transportation at government expense or used any government-owned conveyance.

All in violation of Title 18, United States Code, Section 287.

## COUNT FIVE

54. Paragraphs 4 and 42 through 45 of this Bill of Indictment are realleged and incorporated herein.

55. On or about March 13, 2017, in Buncombe County, within the Western District of North Carolina, and elsewhere, the defendant,

### JOHN PAUL COOK,

made and presented to the United States Department of Veterans Affairs claims and demands upon the United States, that is, claims for travel expense

reimbursement pursuant to the VA's Beneficiary Travel Program, knowing that the claims were false and fictitious, in that the defendant falsely claimed that he had incurred travel expenses by using a privately owned automobile, and falsely claimed that he had not obtained transportation at government expense or used any government-owned conveyance.

All in violation of Title 18, United States Code, Section 287.

## COUNT SIX

56. Paragraphs 4 and 42 through 45 of this Bill of Indictment are realleged and incorporated herein.

57. On or about April 12, 2017, in Buncombe County, within the Western District of North Carolina, and elsewhere, the defendant,

**JOHN PAUL COOK,**

made and presented to the United States Department of Veterans Affairs claims and demands upon the United States, that is, claims for travel expense reimbursement pursuant to the VA's Beneficiary Travel Program, knowing that the claims were false and fictitious, in that the defendant falsely claimed that he had incurred travel expenses by using a privately owned automobile, and falsely claimed that he had not obtained transportation at government expense or used any government-owned conveyance.

All in violation of Title 18, United States Code, Section 287.

## COUNT SEVEN

58. Paragraphs 1 through 45 of this Bill of Indictment are realleged and incorporated herein.

59. On or about August 25, 2017, in Buncombe County, within the Western District of North Carolina, and elsewhere, the defendant,

**JOHN PAUL COOK,**

did willfully and knowingly make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, that is, the United States Department of Veterans Affairs, and did willfully and knowingly falsify, conceal, and cover up by trick, scheme and device a material fact within the jurisdiction of the United States Department of Veterans Affairs. That is, the defendant concealed his true visual acuity by falsely claiming during an eye examination that he was unable to recognize test letters at one foot or closer with either eye; and by falsely giving responses consistent with having a visual acuity no better than 5/200 in either eye, as described more fully in Paragraph 38 of this Bill of Indictment.

All in violation of Title 18, United States Code, Section 1001.

## NOTICE OF FORFEITURE

60. Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

a. All property which constitutes or is derived from proceeds of the violations set forth in this Bill of Indictment; and

b. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a).

61. The Grand Jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds stated above: A forfeiture money judgment in the amount of at least $978,138, such amount constituting the proceeds of the violations set forth in this Bill of Indictment.

A TRUE BILL:



R. ANDREW MURRAY
UNITED STATES ATTORNEY

*Richard Lee Edwards* (signature)
RICHARD LEE EDWARDS
ASSISTANT UNITED STATES ATTORNEY