UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| UNITED STATES OF AMERICA | ) DOCKET NO.: 1:20-CR-126 |
|---|---|
| v. | ) **FACTUAL BASIS STATEMENT** |
| JOHN PAUL COOK | ) |

NOW COMES the United States of America, by and through William T. Stetzer, Acting United States Attorney for the Western District of North Carolina, and hereby files this Factual Basis in support of the plea agreement filed simultaneously in this matter.

This Factual Basis is filed pursuant to Local Criminal Rule 11.2 and does not attempt to set forth all of the facts known to the United States at this time. By their signatures below, the parties expressly agree that there is a factual basis for the guilty plea(s) that the defendant will tender pursuant to the plea agreement, and that the facts set forth in this Factual Basis are sufficient to establish all of the elements of the crime(s). The parties agree not to object to or otherwise contradict the facts set forth in this Factual Basis.

Upon acceptance of the plea, the United States will submit to the Probation Office a "Statement of Relevant Conduct" pursuant to Local Criminal Rule 32.4. The defendant may submit (but is not required to submit) a response to the Government's "Statement of Relevant Conduct" within seven days of its submission. The parties understand and agree that this Factual Basis does not necessarily represent all conduct relevant to sentencing. The parties agree that they have the right to object to facts set forth in the presentence report that are not contained in this Factual Basis. Either party may present to the Court additional relevant facts that do not contradict facts set forth in this Factual Basis.

1.  Disability compensation is a benefit paid to United States military veterans by the Veterans Benefits Administration of the United States Department

of Veterans Affairs (VA) due to injuries or diseases sustained while on active duty, or for injuries or diseases that were made worse by active military service.

2. "Individual Unemployability" (IU) is a unique part of the VA's disability compensation program, allowing the VA to pay certain veterans compensation at the 100 percent rate even though the VA has not rated their service-connected disability at the 100 percent disabling level. To be eligible for Individual Unemployability, the veteran must be unable to maintain substantially gainful employment due to a service-connected condition, and must have either one disability rated at 60 percent disabling or more, or multiple disabilities, with one disability rated at 40 percent or higher and a total rating of 70 percent or more.

3. Visual acuity is measured as a number indicating the sharpness or clarity of vision. A visual acuity measure of 20/20 means that a person with 20/20 vision who is 20 feet from an eye chart sees what a person with unimpaired vision can see from 20 feet away. A person with 20/100 vision who is 20 feet away from an eye chart can see what a person with unimpaired vision could see from 100 feet away.

4. During eye examinations, the doctor tests the visual acuity of each eye separately and records that measurement for each eye. The doctor also measures the acuity of "both eyes," meaning the score when the patient is using both eyes simultaneously. This would ordinarily be the same measurement as the one for the better eye. A person with 5/200 vision who is 5 feet away from an eye chart can see what a person with unimpaired vision could see from 200 feet away. The VA rates a person with 5/200 vision or worse (including eyesight that is limited to light perception only) as being blind.

5. The defendant entered on active duty with the United States Army on November 5, 1985. Six months later, on May 5, 1986, he fell from a ladder while on duty and complained that he had hit his head. Although his records showed that he had a lifelong history of amblyopia, sometimes known as "lazy eye," in his right eye, and he had been wearing glasses before enlisting in the Army, he complained that his vision had become worse, especially in his right eye, following the accident.

6. An Army ophthalmology evaluation in May 1987 concluded that he had visual acuity of 20/200 in the right eye and 20/100 in the left eye. An Army medical board ruled that the defendant was "unfit for retention" because his vision could not be corrected with spectacle lenses to at least 20/30 in one eye and 20/200 in the other eye. Based on the board's recommendation, the Army discharged the defendant and placed him on the retired list on August 28, 1987, at 60% disability. The defendant began to receive VA disability compensation.

7. In December 1987, the VA approved the defendant's application for increased compensation based on unemployability, and issued a rating of Individual Unemployability due to his "severe visual deficit."

8. In June 2005, the defendant submitted another claim for benefits to the VA, based in part on an eye examination conducted at the VA in April 2005, which had concluded from the defendant's responses that the defendant's vision in his right eye was "light perception only" and was 5/200 in his left eye.

9. In October 2005, the VA increased his rating based on blindness from 90% to 100% disabling, which was the maximum evaluation allowed under the law for this disability.

10. The defendant's monthly VA disability payments in 1987 were $1,411 per month. With the increases in his disability rating, as well as cost-of-living adjustments and his Special Monthly Compensation, these payments steadily increased over the years. By 2016, the monthly payment had risen to $3,990. In total, from 1987 through 2017, the defendant received $978,138.60 in VA disability payments due to his claimed blindness, and $978,138.60 is therefore the loss amount suffered by the VA in this case. The VA terminated the defendant's blindness-related disability payments in October 2017. The defendant has also been receiving, and continues to receive, VA disability payments related to a back injury, which payments are unrelated to his blindness-related claims and which are not alleged to be fraudulent.

11. Although the defendant claimed to the VA that his loss of vision was so severe that he had only light perception in his right eye, and that vision in his left eye was only 5/200, and that he could no longer drive, in fact the defendant was able to see at a far better level than he was claiming to the VA, and he was

3

therefore able to maintain and renew his driver's license throughout the entire time he was receiving these blindness-related disability payments. To obtain those license renewals, he repeatedly passed DMV-mandated eye examinations revealing a significantly less severe level of visual impairment than he was claiming to the VA. The vision acuity levels he displayed during his DMV-mandated eye examinations would have disqualified him for the VA benefits he was receiving.

12. Among those DMV-mandated eye exams were the following:

    a. January 5, 1995, renewing his North Carolina driver's license, with results, using corrective lenses, of 20/30 vision using both eyes, 20/30 in his left eye, and 20/200 in his right eye;

    b. August 1, 2003, renewing his North Carolina license, with results, using corrective lenses, of 20/30 vision using both eyes, 20/30 in the left eye, and 20/70 in the right eye;

    c. February 15, 2008, renewing his North Carolina license, with results, using corrective lenses, of 20/40 using both eyes, 20/40 in his left eye, and 20/70 in his right eye;

    d. July 19, 2009, as part of his successful application for a South Carolina driver's license, with a result, using corrective lenses, of 20/25 using both eyes, 20/25 in his left eye, and 20/70 in his right eye; and

    e. February 17, 2016, for renewal of his North Carolina license, with results, using corrective lenses, of 20/40 in his left eye and 20/70 in his right.

13. During the time period relevant to this case, the defendant drove vehicles on a regular basis on streets, roads, and highways, including interstate highways and highways with speed limits higher than 45 m.p.h. He also drove his children to school and picked them up from school, drove to medical appointments, to restaurants and shopping, performed errands, and drove on out-of-town trips.

14. During the same time period that the defendant was passing his DMV-mandated eye examinations and was, in fact, regularly driving vehicles on the

4

roads and highways of North Carolina and South Carolina, he was falsely claiming to the VA that he had no more than light perception in his right eye, and that he had severely reduced sight in his left eye, in order to continue receiving his disability payments. These VA-mandated eye examinations included the following:

  a. April 28, 1989, the defendant underwent an eye examination at the VA Medical Center in Johnson City, Tennessee, with a finding that he had no improvement in his right eye, and that his corrected distance vision in his left eye was 20/400, and his corrected near vision was 20/100;

  b. November 17, 2016, in Weaverville, North Carolina, with findings that his uncorrected vision, for both distance vision and near vision, was 5/200 in his left eye and 5/200 in his right eye, and corrected vision for each eye of 5/200, and a doctor's notation that she had simply marked those boxes on the VA form (which were the lowest available boxes) in order to complete the report, but that "the claimant is only light perception (sic) in each eye and cannot see 5/200;"

  c. January 30, 2017, at the VA Medical Center in Johnson City, Tennessee, during which, the defendant claimed that his vision in his right eye was limited to no more than light perception, and that he could not recognize test letters at one foot or closer with either eye; and that he was unable to perceive objects, hand movements, or count fingers at a distance of three feet with either eye;

  d. August 25, 2017, in Asheville, North Carolina, finding vision with corrective lenses of 5/200 in each eye for distance vision, 5/200 in the right eye for near vision, and 20/200 in the left eye for near vision.


WILLIAM T. STETZER
ACTING UNITED STATES ATTORNEY

*/s/ Richard Lee Edwards*
RICHARD LEE EDWARDS
ASSISTANT UNITED STATES ATTORNEY

5

## Defendant's Counsel's Signature and Acknowledgment

      I have read this Factual Basis, the Bill of Indictment, and the plea agreement in this case, and have discussed them with the defendant. Based on those discussions, I am satisfied that the defendant understands the Factual Basis, the Bill of Indictment, and the plea agreement. I hereby certify that the defendant does not dispute this Factual Basis.

_/s/ Emily Jones_                                          DATED: 7/13/21
Emily M. Jones, Attorney for Defendant